**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TRACI HENDERSHOT,**

      **Plaintiff,**

                              **Civil Action 2:17-cv-413**
      **v.**                         **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Traci Hendershot ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the Court for review of Plaintiff's Statement of Errors (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 23), and the administrative record (ECF No. 13). For the reasons that follow, the Court **REVERSES** the Commissioner of Social Security's non-disability finding and **REMANDS** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g) for further consideration consistent with this Order.

## I.      BACKGROUND

Plaintiff protectively filed her application for a Period of Disability and Disability Insurance Benefits on May 8, 2012. In her application, Plaintiff alleged a disability onset of September 29, 2011. Plaintiff's application was denied initially on August 8, 2012, and upon reconsideration on February 6, 2013. Plaintiff sought a hearing before an administrative law judge. Administrative Law Judge Peter Beekman ("ALJ") held a video hearing on February 24,

2014, at which Plaintiff, represented by counsel, appeared and testified. Thomas Nimberger, a vocational expert ("VE"), also appeared and testified at the hearing. On March 24, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. On January 10, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. Plaintiff then timely commenced the instant action.

In her Statement of Errors, Plaintiff raises two issues. First, Plaintiff asserts that the ALJ erred in his evaluation of Plaintiff's credibility with respect to her statements concerning the intensity, persistence, and limiting effects of her symptoms. Second, Plaintiff asserts that the ALJ erred in failing to properly consider Plaintiff's use of a wheelchair and cane as necessary medical devices.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she is 39 years old and lives with her significant other and her teenage son. (R. at 42, 47.) At the time of the hearing, she was 5'8" tall, weighing 308 pounds. (R. at 42.) She previously worked as a patient coordinator and a telemarketer. (*Id.*) At the time of the hearing, she was in a wheelchair and testified she had been confined to a wheelchair since her back surgery on September 30, 2011. (*Id.*) Plaintiff also carried a cane at the time of the hearing, which she testified she used "for stability for the time that I can stand." (R. at 44.)

When asked by the ALJ how long she could be on her feet, Plaintiff stated she could stand "approximately between a minute, [and a] minute-and-a-half." (R. at 42.) Asked to

describe her average day, Plaintiff stated that she just sits in her recliner from the time she wakes up and that she does nothing more.   (R. at 43.)   When pressed by the ALJ, Plaintiff stated she does not read, only goes through the mail when it is brought to her, will watch the news on TV, and spends time talking to her son.   (*Id.*)   She later added that she does nothing for her own enjoyment.   (R. at 44.)   Plaintiff further testified that she cannot walk more than 30-40', with the use of a cane, but still needs to stand occasionally due to the pain from sitting.   (R. at 44-45.) During the hearing, requested and was afforded a brief break to stand to relieve her pain.   (R. at 45.)   On questioning by her attorney, Plaintiff testified that she needs assistance handling her basic daily affairs, including taking care of her personal hygiene.   (R. at 47.)

Plaintiff testified that she has had suicidal ideations and is suffering from depression due to her pain.   (R. at 44-46.)   When asked by the ALJ whether she is taking medication for her depression, or if she is seeing a psychiatrist or psychologist, Plaintiff responded that she is not, but that her doctor is aware of her depression.   (R. at 45-46.)   She further indicated that medication for depression made her sick and that she has not been given an alternate prescription.   (*Id.*)

When asked by the ALJ about her level of pain during the hearing, on a scale from 1 to 10, Plaintiff indicated her pain level was 9 out of 10.   (R. at 46.)   Plaintiff testified that she was not taking anything for pain because she is allergic to pain medications, specifically opioids at the high dose the doctors believe necessary to control her pain.   (*Id.*)   Plaintiff's allergic reactions to medication range from abdominal cramping and nausea to respiratory depression. (R. at 49.)   She further indicated that she has tried multiple different medications, including over the counter drugs, and all have been either ineffective or caused adverse reactions.   (R. at 46.)

Plaintiff explained that her pain is a "crushing pain," which she described as "deadweight" in her lower back, "crushing down on [her] tailbone."   (R. at 48-49.)   In an effort to reduce her pain level, Plaintiff said she uses icepacks all day and that she was using two icepacks, one behind her back and one under her coccyx, during the hearing.   (R. at 53.)

Upon examination by her attorney, Plaintiff testified that she has received lumbar facet injections, epidural injections, and sacroiliac point injections, none of which provided any pain relief.   (R. at 50-51.)   Plaintiff further testified that she receives coccydynia injections, which provide temporary pain relief, lasting approximately one month.   (R. at 51.)   Although the coccydynia injections do decrease the pain level to a 4 or 5 out of 10, they cause worsening symptoms for approximately two weeks before providing relief.   (*Id.*)   Additionally, the injections only help with pain while sitting due to their effect on the coccyx.   (*Id.*)   Plaintiff indicated that she can have the injections approximately three times within three months.   (R. at 57-58.)

When asked by her attorney about "constantly moving" while sitting, Plaintiff replied that she can only sit for "20, 25 minutes to a half hour" at a time.   (R. at 53.)   She explained that after that time has elapsed, she uses her cane to help herself out of her chair and stand or walk a little before sitting back down.   (*Id.*)

When Plaintiff's counsel pointed out that Plaintiff had been prescribed a wheelchair and was using an ambulatory cane, the ALJ pointed out that he "understood that" and "took that into consideration when [he] gave [his] RFC sitting eight [hours] out of eight [hours]."   (R. at 67.)

**B.     Vocational Expert Testimony**

The VE testified at the administrative hearing that Plaintiff's past work included the

following positions and classifications: patient care coordinator, a semiskilled, sedentary position; telemarketer, a semiskilled, sedentary position; and nurse assistant, a semiskilled position, performed at heavy to very heavy level of exertion. (R. at 59.) The VE testified that a hypothetical individual with Plaintiff's vocational profile and the residual functional capacity ("RFC")[1] the ALJ ultimately assessed could not perform Plaintiff's past work, but could perform approximately 139,000 sedentary, unskilled jobs in the national economy (approximately 1,700 jobs locally) such as polisher, addresser, and document preparer. (R. at 60-61.) The VE also testified that if Plaintiff were off task for 20% of the work day, she could not sustain competitive employment. (R. at 61.) In response to questioning by Plaintiff's counsel, the VE testified that if Plaintiff were to miss more than two-days of work per month, she likewise could not sustain competitive employment. (*Id.*)

### III. MEDICAL RECORDS

#### A. Diana Taylor, M.D.

In December 2010, Plaintiff underwent an x-ray ordered by her primary care physician, Dr. Taylor, which revealed degenerative disc disease in her lower back, from L4 to S1. (R. at 224.) On January 10, 2011, Plaintiff complained to Dr. Taylor about ongoing severe pain in her lower lumbar spine. (R. at 304.) Dr. Taylor noted that although Plaintiff was not in acute distress and there was no tenderness to palpation, the x-rays indicated "significant degradation of L4-5 and also L5-S1." (*Id.*) Dr. Taylor diagnosed Plaintiff with lumbar degenerative disc disease with persistent disabling pain and ordered an MRI, which confirmed the diagnosis. (R.

---

1. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).

at 304, 222.)

On February 2, 2011, Plaintiff complained to Dr. Taylor that the Vicodin she had been prescribed for her pain was ineffective and was making her nauseous. Plaintiff therefore stopped taking this pain medication. (R. at 305.) Dr. Taylor observed that Plaintiff was in obvious distress, prescribed morphine sulfate for Plaintiff's pain, and referred her to the Spine Center for consultation. (*Id.*)

On August 19, 2011, Plaintiff complained to Dr. Taylor about difficulty sleeping due to pain. (R. at 306.) Dr. Taylor advised that Plaintiff would need to get her blood pressure under control before she could have surgery for the pain and prescribed Ambien for sleep in the meantime. (*Id.*) Dr. Taylor's notes reflect that the morphine sulfate she had prescribed Plaintiff had been ineffective and had caused abdominal pain. (*Id.*)

On November 11, 2011, Plaintiff saw Dr. Taylor to discuss ongoing back pain after her back surgery. (R. at 311-12.) Dr. Taylor prescribed a one-month supply of Vicodin, as it was then helping to control the pain. (R. at 3512.) The next month, Plaintiff complained of pain radiating down her upper left leg. (R. at 363.) Dr. Taylor ordered an x-ray, which largely showed a satisfactory post-operative appearance, but did show faint paravertebral ossification. (R. at 319.)

Dr. Taylor completed a Participation Ability Request Form on September 12, 2013, indicating that Plaintiff was unable to participate in the following activities indefinitely: classroom-based activities, educational activities, vocational activities, skills training, volunteer work or community service, and job searching. (R. at 698.)

**B.     Kedar Deshpande, M.D. and the Spine Center**

On February 11, 2011, Plaintiff was evaluated by Dr. Deshpande at the Spine Center, to whom she was referred by Dr. Taylor, for treatment of lower back pain.   (R. at 216.)   Dr. Deshpande examined Plaintiff and found she had a normal gait and walking motion, tenderness in her lower back, normal flexion, and decreased extension with pain.   (R. at 218.)   Upon examination, Dr. Deshpande diagnosed Plaintiff with displacement of the lumbar interval disc and lumbosacral spondylosis without myelopathy and scheduled her for bilateral facet injections. (R. at 218-19.)   Plaintiff received the injections on March 10, 2011.   (R. at 220-21.)

Plaintiff had a follow-up visit at the Spine Center on March 16, 2011, with Dr. Jimmy Henry, M.D., who indicated that Plaintiff had a normal gait, station, and muscle strength, but that she had tenderness to palpation in her lower back.   (R. at 322-24.)   The examination further indicated decreased extension with pain.   (*Id.*)   Dr. Henry again recommended bilateral facet injections.   (R. at 324.)

**C.     Robert E. Gould, D.O.**

On May 6, 2011, Plaintiff went to Grady Memorial Hospital, where she was seen by Dr. Gould.   Dr. Gould performed a physical examination and noted that palpation of Plaintiff's lower lumbar revealed moderate to severe discomfort and that gluteal tenderness was mild to moderate.   (R. at 496.)   Dr. Gould prescribed gabapentin and baclofen, along with the use of a TENS unit for physical therapy.   (*Id.*)   He also scheduled bilateral sacroiliac injections, which were completed on May 25, 2011.   (R. at 496, 393-94.)   Dr. Gould noted that a spinal cord stimulator may be necessary.   (*Id.*)

On June 8, 2011, Plaintiff returned to Dr. Gould complaining of pain at a 10 out of 10

level.   (R. at 413.)   Dr. Gould then prescribed Plaintiff Dilaudid and epidural steroid injections. (*Id.*)

Following her surgery, Plaintiff returned to Dr. Gould on January 12, 2012, at which time he diagnosed her with post laminectomy syndrome.   (R. at 405.)   Dr. Gould ordered an EMG, which revealed very mild acute bilateral S1 radiculopathies and no evidence for plexus disorder, peripheral neuropathy/polyneuropathy, myopathy, or motor neuron disease.   (R. at 337-39.)

## D.      Rebecca P. Brightman, M.D. and Riverside Methodist Hospital

On September 30, 2011, Dr. Brightman performed an L4-L5, L5-S1 decompression surgery with bilateral interbody fusion.   (R. at 353.)   Additionally, Dr. Janet Bay, M.D., performed a laminectomy of L4-L5 with interbody fusions at L4-L5 and L5-S1 with posterolateral fusion and fixation of L4 through S1.   (R. at 356.)   Following the surgery, Plaintiff began to experience additional severe lower back pain.   She was admitted to Riverside on October 28, 2011, where she received an MRI which indicated a large fluid collection at the surgery site causing compression of the thecal sac.   (R. at 236.)

On October 31, 2011, Plaintiff was evaluated by Dr. Kenneth W VanDyke, D.O., for a consultation regarding the post-operative fluid collection.   (R. at 245-48.)   Upon examination, Dr. VanDyke noted that Plaintiff showed normal, full mobility in her extremities, with some tenderness on palpation.   (R. at 2947.)   Dr. VanDyke also noted that the fluid collected was positive for pseudomonas, but that Plaintiff otherwise showed no signs of a post-operative infection.   (R. at 245.)

Plaintiff returned to Dr. Brightman on December 22, 2011, complaining of worsening pain at the surgery site and "shocking pains" in her left leg.   (R. at 343.)   A physical exam

showed that Plaintiff had full strength in her lower extremities and that the incision had healed well. (*Id.*) Dr. Brightman recommended re-imaging by MRI, which was performed on February 7, 2012. (R. at 343, 298.) The MRI revealed that the fluid collection had decreased in size and no longer compressed the thecal sac. (R. at 288.) Although the image was slightly degraded due to Plaintiff's obesity, the MRI showed no abnormalities in Plaintiff's lumbar, including at the surgery site. (R. at 298-99.) However, no axial T2 images were taken due to Plaintiff's pain level and discomfort. (R. at 299.)

Plaintiff returned to Dr. Brightman on May 14, 2012, complaining of pain that had reached pre-surgical levels. (R. at 341.) Dr. Brightman indicated that she had reviewed Plaintiff's images and that they looked excellent, suggesting there was nothing concerning in the images. (*Id.*) Dr. Brightman indicated that she would, however, like Plaintiff to be evaluated for epidural injections and that she would like her to undergo a CT scan. (*Id.*) She also explained to Plaintiff that there are people who continue to have back pain following spinal surgery, and particularly fusion. (*Id.*) Finally, Dr. Brightman opined:

> "I do feel that she is in [the category of people who have continued post-operative pain] and although we have not exhausted all of her treatment, I think that currently we need to focus on pain management particularly as well as physical therapy. She is debilitated and again, has not been able to undergo any physical therapy and I think this is a problem as well."

(*Id.*)

## E. Joseph A. Shehadi, M.D.

On January 5, 2012, Plaintiff saw Dr. Shehadi, complaining of severe pain in her lower back. (R. at 327.) Plaintiff told Dr. Shehadi that her average pain level was an 8 out of 10, with her best days being 7 out of 10. (*Id.*) Dr. Shehadi conducted a physical exam and

observed normal gait and station, range of motion, and muscle strength.   (R. at 329.)   Plaintiff

returned to Dr. Shehadi on February 2, 2012, for a follow-up visit, at which time Dr. Shehadi

again noted normal gait and station.   Based on the examination findings, Dr. Shehadi

recommended conservative treatment, including physical therapy and analgesics.   (R. at 333-

34.)

## F.     State Agency Evaluations

On August 3, 2012, state agency physician Elaine M. Lewis, M.D., reviewed the record

and assessed Plaintiff's physical functioning capacity.   (R. at 71-77.)   Dr. Lewis concluded that

Plaintiff could perform sedentary work with postural limitations, including: never climb ladders,

rope, or scaffolds; occasionally climb ramps or stars, stoop, kneel, crouch, and crawl; and

frequently balance.   (R. at 74.)   Dr. Lewis also opined that Plaintiff can stand and/or walk with

normal breaks for a total of 4 hours and can sit with normal breaks for a total of 6 hours in an 8-

hour workday.   (R. at 73.)   On December 11, 2012, state agency physician Maureen Gallagher,

D.O., reviewed the record upon reconsideration and affirmed Dr. Lewis's assessment.   (R. at 84-

91.)

## G.     Wexner Medical Center at The Ohio State University

On August 28, 2012, spinal surgeon Dr. Safdar Khan, M.D., examined Plaintiff and

observed that she was wheelchair bound and had limited range of motion in her lumbar spine,

with pain.   (R. at 617-18.)   He also indicated, however, that he was unsure of the source of

Plaintiff's pain, and ordered a CT scan to investigate the fusion.   (R. at 618.)   On September 19,

2012, Plaintiff returned to Dr. Khan's office to discuss the results of the CT scan.   At the time,

Plaintiff indicated her symptoms were unchanged.   (R. at 613-14.)   Dr. Kahn again noted that

Plaintiff was wheelchair bound and, although the results of the physical examination were largely normal, she had limited range of motion with pain in her lumbar spine. (*Id.*) The CT scan showed the right S1 screw had shifted 1 cm anterior to the cortical margin but did not otherwise indicate abnormal results. (R. at 614.)

On February 7, 2013, Plaintiff visited Dr. Raj Swain, M.D. Dr. Swain examined Plaintiff and noted that she had developed an antalgic gate. (R. at 648.) Dr. Swain further observed that Plaintiff had normal muscle strength, limited range of motion in extension of her lumbar spine, difficulty with rotation and lateral bend bilaterally, and moderate tenderness over the midline coccyx and the bilateral ischial bursa. (*Id.*) Dr. Swain diagnosed Plaintiff with coccydynia, ischial bursitis, and lumbar post laminectomy pain syndrome. (R. at 650.) He recommended conservative treatment initially, including coccygeal injections, but suggested more invasive procedures may be necessary if the conservative treatment were to fail. (*Id.*)

On March 4, 2013, Dr. Swain performed a coccygeal injection. (R. at 673.) The injections appeared to decrease Plaintiff's pain from 8 out of 10, to 6 out of 10, and Dr. Swain subsequently ordered a repeat series of injections. (R. at 702-03.)

On September 17, 2013, Plaintiff was seen by Dr. Steven A. Severyn, M.D., for pain management. (R. at 726.) During her interview with Dr. Severyn, Plaintiff stated her pain level was then a 9 out of 10 but had been as high as "a million." (*Id.*) Dr. Severyn performed a physical exam and observed normal range of motion in all major joints, normal muscular strength, and tenderness at the coccyx and perivertebral lumbar erector region. (R. at 730.) Dr. Severyn prescribed a series of local anesthetic injections without steroids, which he gave Plaintiff on October 14, 2013. (R. at 730, 735-38.)

# IV.    THE ADMINISTRATIVE DECISION

On March 24, 2014, the ALJ issued his decision.   (R. at 20-29.)   The AJL first found that Plaintiff meets the insured status requirements September 20, 2016.   At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 29, 2011, the alleged onset date.   (R. at 22.)   The ALJ found that Plaintiff had the severe impairments of degenerative disc disease and obesity.   (*Id.*)   He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (R. at 24.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that Ms. Hendershot has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and meaning she can lift ten pounds occasionally an up to ten pounds

---

2.   Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.   *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

frequently; stand/walk for 1 hour out of eight hours, but can sit for eight hours out of eight hours; frequently push/pull, but never foot pedals; occasionally use ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance; occasionally stoop; never kneel; occasionally crouch; never crawl; occasionally reach bilaterally when seated; constantly handle, finger, and feel; no visual communications deficits; should avoid dangerous machinery and unprotected heights; and should do no complex tasks, but can do simple, routine, unskilled tasks.

(*Id.*) In reaching this determination, the ALJ followed a two-step process. First, the ALJ found that "[a]fter careful consideration of the evidence, . . . [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. at 26.) Second, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible." (*Id.*)

Relying on the VE's testimony, the ALJ found that even though Plaintiff is unable to perform her past work, she can perform jobs that exist in significant numbers in the national economy. (R. at 27-28.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 28.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff contends that the ALJ erred in his evaluation of Plaintiff's credibility with respect to her statements concerning the intensity, persistence, and limiting effects of her symptoms, specifically as related to her pain. Specifically, Plaintiff argues that the ALJ failed to properly consider medical evidence in the record reflecting abnormal results and failed to comply with applicable regulations in evaluating Plaintiff's credibility. The Court agrees that the ALJ's cumulative errors in evaluating the record with respect to Plaintiff's credibility warrant

reversal and remand.   The Court, therefore, declines to analyze and resolve the alternative basis

Plaintiff asserts supports reversal and remand.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility

assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain.   20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).   First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.   20 C.F.R. § 416.929(a).   Second, if the ALJ finds that such impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.   *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he

had the opportunity to observe the witness's demeanor."   *Infantado v. Astrue*, 263 F. App'x 469,

475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997));

*Sullenger v. Comm'r of Soc. Sec.*, 255 Fed. Appx. 988, 995 (6th Cir. 2007) (declining to disturb

the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve

conflicts in the evidence, or decide questions of credibility" (citation omitted)).   This deference

extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective

complaints of pain."   *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting

*Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)).   Despite this

deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial

evidence."   *Walters*, 127 F.3d at 531.   Furthermore, the ALJ's decision on credibility must be

"based on a consideration of the entire record."   *Rogers*, 486 F.3d at 247 (internal quotation

omitted).   An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."   *Walters*, 127 F.3d at 531.   In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including factors precipitating or aggravating symptoms; the effectiveness of medication; and treatment other than medication.   20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996)[3]; *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

As set forth above, the ALJ determined that Plaintiff's statements concerning the

_____

3.   SSR 16-3p, which became effective March 28, 2016, superseded and rescinded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1119029, at *1.   Because SSR 16-3p does not include explicit language to the contrary, it is not to be applied retroactively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) ("The Act does not generally give the SSA the power to promulgate retroactive regulations."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541–42 (6th Cir. 2007) (declining to retroactively apply a newly effective Social Security Ruling in the absence of language reflecting the Administration's intent to apply it retroactively).

intensity, persistence, and limiting effects of her symptoms "are not entirely credible." (R. at 26.) In support of his credibility assessment, the ALJ offered the following discussion of Plaintiff's allegations and his reasons for discounting her allegations:

In regards to her degenerative disc disease, she states she has chronic pain on a 24/7 basis, fatigue, weakness, and insomnia in which standing, walking, and lack of sleep aggravates. She states she has tried chiropractic care, physical therapy, and facet joint injections, and that painkillers, such as Vicodin and Percocet have not relieved the pain, so she stopped taking them. She is currently taking Lyrica, but complains it causes fatigue and weight gain. She underwent an L1-L5, L5-S1 decompression with bilateral interbody fusion surgery on September 30, 2011, which was followed by skilled nursing care for several weeks. While there was post-op fluid collection, this decreased after surgery. However, she states that the surgery made her pain worse. Thus, the year after she had surgery, she underwent a caudal epidural steroid injection, sacroiliac joint injections, use of a TENS unit, and trigger point injections. She had brief relief following a coccygeal injections. She states she uses a cane or walker around the house, but uses a wheelchair for long distances, and that she takes Ambien to sleep. She states that despite all of this conservative treatment, that none of the treatments [have] worked.

Results of images partly support her allegations. Results of an MRI of the lumbar spine revealed moderately severe degenerative disease at L5-S1 with a diffuse disc bulge and endplate spurring, mild right foraminal narrowing at L4-L5 related to a right subarticular/foraminal disc protrusion, and mild-to-moderate degenerative endplate change at L4-L5, but the results also revealed no focal disc herniation or central or foraminal stenosis at the remaining levels and no fracture or spondylolisthesis. Yet, results of images after surgery revealed a satisfactory post-operative appearance. Specifically, results of an MRI of the lumbar spine revealed stable postsurgical changes from the surgery at the L4 through S1 levels without evidence of recurrent disc herniation, spinal stenosis or foraminal narrowing. In addition, results of x-rays of the lumbar spine showed aligned vertebra, aligned facet joints, and disc spaces preserved other than at L4-L5 and L5-S1. Additionally, while results of a CT scan of the lumbar spine showed straightening of the normal cervical lordosis, the results also showed normal alignment, normal vertebral height and normal paraspinal soft tissue. Moreover, results of degenerative changes of the L3-L4 facets with a very mild bulge of the annulus at L3-L4. In addition, results of an EMG study revealed only very mild acute bilateral S1 radiculopathies, and no evidence of plexus disorder, peripheral neuropathy/ polyneuropathy, myopathy or motor neuron disease.

Furthermore, results of physical examinations revealed tenderness of the lumbar spine and decreased extension, but normal flexion, but results from other physical examinations revealed no tenderness, full range of motion of all extremities, 5/5 muscle strength of the lower extremities, intact sensation, and negative straight leg raise bilaterally. In addition, results of a physical examination on September 19, 2012 revealed that, although she was in a wheelchair, she had 5/5 strength in her bilateral upper extremities and range of motion. In addition, inspection of the back was normal, with no tenderness noted. Additionally, her muscle tone was normal, without spasm, and a negative straight leg raise. The examining physician even commented that he did not know where [Plaintiff's] low back pain is coming from. Additionally, results of later physical examination revealed similar results of normal strength, range of motion, sensation, and reflexes.

In regards to her obesity, she is five feet and seven-and-a-half inches tall, but weighs 284 pounds. Recently, she has continued to gain weight, and now weighs 300 pounds, which results in a body mass index of 47. She states her weight gain is due to being sedentary from chronic pain. Yet, results of physical examinations indicated that she had a normal gait and station until 2013. In additional, as discussed above, the results have also shown she has generally had normal strength and motion.

(R. at 25-26 (internal citations to record omitted).)

The ALJ's credibility analysis in the instant case falls short. Notwithstanding foregoing lengthy discussion, the ALJ's summary reveals that he failed to consider all of Plaintiff's allegations and that he misstated and/or omitted discussion of important record evidence that could impact his assessment.

To begin, the ALJ acknowledged that "standing, walking, and lack of sleep" precipitate and aggravate Plaintiff's symptoms, but omitted any discussion of her repeated allegation that sitting also aggravates her pain, as well as Plaintiff's allegations regarding how she relieves the pain caused by sitting. As discussed above, Plaintiff specifically testified at the hearing that she needs to alternate between sitting and standing due to the pain caused by sitting, later explaining that the longest she could sit for any one period of time was 30 minutes before she would need to briefly stand or walk. (*See* R. at 45, 53.) Indeed, during the hearing, Plaintiff required a break

to "stand for a second" in order to relieve her pain. (R. at 45.) Plaintiff added that she uses a cane for stability to help herself out of her wheelchair and that she uses ice to relieve the pain she experiences while sitting. (R. at 53.) The Court cannot conclude that the ALJ's failure to consider Plaintiff's allegation that sitting aggravates her pain such that she needs breaks to stand is harmless because the RFC the ALJ assessed provides that Plaintiff "can sit for eight hours out of eight hours," (R. at 24), a limitation the ALJ apparently included because he found it credible that Plaintiff required the wheelchair she had been prescribed, (*see* R. at 66-67 (indicating that he "gave" Plaintiff "RFC sitting eight out of eight" in light of the fact she had been prescribed a wheelchair)).

Significantly, the ALJ's conclusion that Plaintiff could sit for "eight hours out of eight hours" is *less* restrictive than any opinion contained in the record, including the opinions of the state agency reviewing physicians, whose opinions the ALJ assigned the greatest weight. (*See* R. at 73, 89 (Drs. Lewis and Gallagher opining that with normal breaks, Plaintiff could sit for only 6 hours in an 8-hour work day); R. at 26 (ALJ explains that he assigns "more weight" to the opinions of Drs. Lewis and Gallagher because "they have specialized knowledge" and their opinions are "mostly consistent with the record as a whole").) Yet the ALJ provided no explanation for why he rejected the opinions of Drs. Lewis and Gallagher with respect to how long Plaintiff could sit. The absence of any such discussion of how the evidence supports the ALJ's conclusion that Plaintiff could sit eight hours per day, together with the ALJ's complete failure to even acknowledge Plaintiff's allegation that sitting aggravates her symptoms, leads this Court to conclude that substantial evidence does not support his credibility assessment and RFC determination.

In addition, in assessing Plaintiff's credibility and calculating her RFC, the ALJ appears to have misstated or failed to consider important record evidence. For example, the ALJ stated that Plaintiff exhibited a normal gait until 2013, citing Dr. Swain's February 2013 examination. Plaintiff's examination records, however, reflect gait deficits beginning in 2012. (*See, e.g.*, R. at 613 (September 2012 exam reflecting "observed gait deficits include she is in a wheelchair"); R. at 630 (November 2012 exam reflecting "gait is not normal").) Relatedly, although the ALJ correctly points out that many of Plaintiff's physical evaluations were largely normal, reflecting normal gait and station, strength, and range of motion, he does not appear to have considered the timeline of the exams, which suggest that Plaintiff's physical conditioned worsened. Instead, the ALJ acknowledges that exams showing worse results exist, but favors older, normal exams without explanation. By way of example, in August 2012, Dr. Khan examined Plaintiff and found that, although much of her exam was normal, Plaintiff exhibited limited range of motion with pain in her lumbar spine. (R. at 618.) Six months later, in February 2013, Dr. Swain examined Plaintiff and observed worsening symptoms, including antalgic gait, limited range of motion in extension of her lumbar spine, difficulty with rotation and lateral bend bilaterally, and moderate tenderness over the midline coccyx and the bilateral ischial bursa. (R. at 648.) Although the ALJ identified this exam in his decision, he dismisses the worsening gait and physical exam findings without explanation, simply noting "she has had a normal gait and station until 2013." (R. at 26.) Absent some explanation for why older, normal exams should control, the Court is unable to ascertain how countervailing evidence entered into the ALJ's considerations. *Cf. Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014) ("[A]lthough the ALJ stated that she considered all the medical evidence marked as exhibits, her

reasoning shows that she discounted the severity of Gentry's conditions—based on periodic improvements and cessation of treatment—by failing to address certain portions of the record, including the evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications.").   In addition, the ALJ incorrectly stated that Plaintiff stopped taking prescribed painkillers because they did not work, when her testimony and the medical records reflect that Plaintiff discontinued these prescriptions due to serious reactions such as respiratory depression, abdominal cramping, and nausea.   (*See,* R. at 25, 46, 49, 305-306.); *See also Calhoun v. Comm'r of Soc. Sec.*, 338 F. Supp. 2d 765, 774-75 (E.D. Mich. June 14, 2004) ("Because the ALJ's credibility determination and his assessment of Plaintiff's subjective complaints of pain were based on an inaccurate analysis of the record, it cannot be said that these determinations were supported by substantial evidence.").

In summary, the errors and omissions outlined above prevent this Court from conducting a meaningful review and deprive the ALJ's credibility and RFC assessment of substantial evidence such that remand is required.

## VII.   DISPOSITION

Due to the errors outlined above, the Court **REVERSES** the Commissioner of Social Security's non-disability finding and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Opinion.

**IT IS SO ORDERED**.

 /s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE